Below is an opinion of the court.

_David W. Hercher_
_____
DAVID W. HERCHER
U.S. Bankruptcy Judge

## UNITED STATES BANKRUPTCY COURT

## THE DISTRICT OF OREGON

| | |
|---|---|
| In re | |
| **Thomas Bryon Cattell**, | Case No. 19-33823-dwh13 |
| Debtor. | |
| **Thomas Bryon Cattell**, | Adversary Proceeding No. 19-03123-dwh |
| Plaintiff, | (Lead action) |
| v. | **MEMORANDUM DECISION**[1] |
| **Victoria D. Deeks**, an individual, **Garrett Welch,** and **Carol Williams**, | |
| Defendant. | |
| **Thomas Bryon Cattell**, an individual, | Adversary Proceeding No. 20-03024-dwh |
| Plaintiff, | |

---

[1] This disposition is specific to this action. It may be cited for whatever persuasive value it may have.

Page 1 – MEMORANDUM DECISION

v.

**Alison Hohengarten; Francis
Hansen & Martin LLP**, an Oregon
limited liability partnership;
**Connor Deeks**; and
**PricewaterhouseCooper LLP,**

Defendants.

## I.    Introduction

In these two consolidated adversary proceedings, the plaintiff is the
chapter 13 debtor, Thomas Bryon Cattell, and the remaining defendants are
Victoria D. Deeks, Connor Deeks, and Garrett Welch. Because the Deekses
share a last name, I will refer to them as Victoria and Connor. Victoria is
Connor's mother.

Cattell and Victoria formed a business partnership to develop the
Skyliners Road property and to engage in fishing in Alaska. The partnership
should be dissolved, if it hasn't already been dissolved. In the course of the
winding up of the partnership's business, I find that the partnership owes
Victoria for amounts she paid for partnership purposes totaling $72,554.49.
She is entitled to retain the $908.27 held in her lawyer's client trust as
partial payment of that amount. Her net claim of $71,646.22 is against the
partnership, and her contribution claim against Cattell is that he be required
to contribute his share—one-half—of the amount due to her from the
partnership. She is entitled to recover from him $35,823.11.

With respect to Connor, I conclude that (1) he did not breach a fiduciary duty to Cattell, (2) Cattell is not a vulnerable person, and (3) "estoppel" is not a basis for Cattell to recover from Connor.

Finally, I conclude that Cattell is not entitled to any recovery from Welch. Because the transfer to Welch was by Victoria, not Cattell, Cattell is not entitled to recover the property from Welch.

## II. Background

### A. Consolidation

After I granted unopposed motions to consolidate these two actions on March 10, 2020,[2] most papers in the nonlead action, and all those in the lead action, were filed under the adversary proceeding number of the lead action. References to the docket numbers of papers filed in the nonlead action include that action's number, 20-03024, and the paper's ECF number. References to papers filed in the main chapter 13 bankruptcy case include the main case number, 19--33823, and the paper's ECF number. References to the docket numbers of papers filed in the lead action—the bulk of the references to filed papers—include just the paper's ECF number.

### B. Removal

Cattell commenced the lead action in Deschutes County, Oregon, Circuit Court on October 18, 2018, and he removed it on November 13, 2019. The paper that initiated that action was named "Petition for Dissolution of

---

[2] ECF No. 9; No. 20-03024 ECF No. 14.

Case 19-03123-dwh    Doc 551    Filed 10/11/22

Domestic Partnership."[3] After removal, Cattell filed a second amended complaint,[4] which Victoria answered with counterclaims,[5] and Welch answered without counterclaims.[6]

Cattell commenced the nonlead action in Multnomah County, Oregon, Circuit Court on January 23, 2020, and it was removed on February 20, 2020, by defendants who have since been dismissed. No defendant answered before removal. After removal, Connor answered without counterclaims.[7]

## III. Victoria

I will address the claims in the order in which the defendants became parties: Victoria, Connor, and Welch.

### A. *Main-case background*

In Cattell's main chapter 13 bankruptcy case, Victoria filed two proofs of claim. The second, claim 9-1, is for $71,000, and she describes its basis as "lost sale proceeds from interference with contract 925,000-854,000." He objected to that claim, stating that resolution of the lead action "should resolve the claim."[8] In her response to the claim objection, she essentially agreed, saying that the claim "is at issue in" the lead action and "may be resolved within that proceeding."[9]

---

[3] ECF No. 1 at 3 ¶ 6, Ex. 1.
[4] ECF No. 185.
[5] ECF No. 195.
[6] ECF No. 215.
[7] No. 20-3024 ECF No. 22.
[8] No. 19-33823 ECF No. 36 at 2 ¶ 2.
[9] No. 19-33823 ECF No. 44.

Page 4 – MEMORANDUM DECISION

## B.    Jurisdiction

The district court has referred to this court all bankruptcy cases and proceedings arising under title 11 of the United States Code (the Bankruptcy Code) or arising in or related to bankruptcy cases. With the consent of all parties to an action that isn't a core proceeding but is otherwise related to a bankruptcy case, the district court has referred the proceeding to this court to enter appropriate orders and judgments in the proceeding, subject to appellate review.[10] The referral includes all removed claims and causes of action.[11]

Victoria's claims against Cattell are core claims as to which this court may enter final orders or judgment.[12]

Because resolution of Cattell's claims against Victoria could have resulted in a recovery by him, which in turn could have affected the administration of the estate, the claims between them are least related to the main case. Because Cattell[13] and Victoria[14] have both consented to entry of final orders or judgment in the lead action, it is unnecessary to address whether the claims between them are core or noncore but related.

---

[10] LR 2100-2(a)(1).
[11] LR 2100-2(a)(2).
[12] 28 U.S.C. § 157(b)(2)(B).
[13] ECF No. 185 at 2 ¶ 1.
[14] ECF No. 195 at 2 ¶ 1.

### C. *Cattell's claims against Victoria*

In the lead action, the complaint includes the following nine claims against Victoria.

#### 1. **First claim: Dissolution of common-law partnership**

In the first claim in the lead action, which is only against Victoria, Cattell asks that the partnership between her and him be dissolved and wound up.[15] Victoria disputes the existence of a partnership.[16]

##### (a) *Existence of a partnership*

Cattell and Victoria do not dispute that Oregon law governs a partnership between them, including whether one was formed. Oregon statutes governing partnerships are in Oregon Revised Statutes chapter 67, known as the Oregon Revised Partnership Act or RPA.[17]

Determining whether Cattell and Victoria were business partners is difficult here due to the complicated nature of their relationship. It's undisputed that they were domestic partners. She contends that that's all they were, while he argues that they were also business partners. Combining assets and jointly investing in real estate—the major activities that he alleges were business activities—are also consistent with what one would expect domestic partners to do. For example, if a couple buy land and build a house together, it would be strange to say that this makes them business

---

[15] ECF No. 185 at 19–20 ¶¶ 83–85.
[16] ECF No. 400-155 Ex. 156 at 1.
[17] Or. Rev. Stat. § 67.815.

partners—even though they may well have intended to profit from their investment.

Nevertheless, for the following reasons, I conclude that Cattell and Victoria were business partners. Most importantly, their joint undertakings were ultimately dissimilar to the kind of joint undertaking one would expect from domestic partners who are not also business partners. In my prior example of a couple investing in a home, it may be true that they intend to profit from doing so, but probably their main purpose would be to have a place to live. If the couple instead buy a second home to operate as a for-profit vacation-rental business, it would seem much more plausible to call them business partners as well as spouses. Cattell and Victoria had a mutually understood objective of building a resort on their Skyliners property, which is not an ordinary domestic activity. They also jointly invested in a fishing enterprise—again, not an activity one expects of domestic partners who are not engaged in business.

A second reason for finding that they were partners is that they both literally referred to themselves as "50-50 partners." There's no reason in principle that this expression couldn't have meant that they were equal participants in a domestic relationship—which is what Victoria says it meant. But the most natural interpretation is that they understood themselves to be equal business partners. The term "50-50" in particular implies a measurable economic investment or stake in an enterprise, and it's

not a phrase that ordinarily is used by couples who have a domestic, but not business, relationship.

In mid-2017, they both signed an informal agreement acknowledging the partnership's formation and agreeing to dissolve it.[18]

### (b)   *Effect of Mediated Settlement Agreement and stipulated order*

Victoria also argues that, if a partnership existed, it was eliminated by the parties' 2018 Mediated Settlement Agreement (MSA)[19] or the stipulated order that they signed and the Deschutes County Circuit Court entered in 2019.[20]

The MSA was struck during a dispute over Victoria's attempted sale of the property to Pedro Pizarro (identified in the agreement as "Purchaser X"). The gist of the agreement is that Cattell would make a "back-up offer contingent upon the termination of the existing, binding sale agreement of the Property to Purchaser X."[21] If Cattell could provide evidence of his financial wherewithal to follow through with the purchase, Victoria would try to persuade Pizarro to break the existing deal. If Pizarro chose to back out, Victoria and Cattell would then be bound to consummate a sale to Cattell.[22] If not, Cattell agreed to leave the property within three days.[23]

---

[18] ECF No. 400-79 Tr. Ex. 80.
[19] ECF No. 380 PDF 147 Ex. 116.
[20] ECF No. 380 PDF 156 Ex. 117.
[21] ECF No. 380 PDF 147 Ex. 116 at 1 ¶ 1.
[22] ECF No. 380 PDF 147 Ex. 116 at 1 ¶ 2
[23] ECF No. 380 PDF 147 Ex. 116 at 2 ¶ 4.

Page 8 – MEMORANDUM DECISION

Victoria also argues that several provisions of the MSA constitute either an acknowledgment that a partnership never existed or an agreement to terminate it. She points first to paragraph A, an introductory statement that the parties "agree to settle and resolve all matters in dispute." That statement says nothing about whether a partnership had existed or was then being terminated.

Second, Victoria points to paragraph 6, which refers to paying debts "associated with the Parties [*sic*, "Parties'"] prior partnership." That phrase could be read as an acknowledgment that the partnership had previously ceased to exist. Or it could refer to a partnership that had existed but might or might not continue to exist. The latter understanding of "prior relationship" is consistent with the context in which the agreement was negotiated and drafted: she had contended (as she does now) that there was no business partnership, and it would not be surprising for the agreement to sidestep that contentious issue and focus instead on the immediate dispute about the property sale. That the agreement was drafted to avoid such a contentious issue would be consistent with the intense negotiations over the terms of the document, as reflected by its many hand-written edits and additions. By statute, a partnership ceases to exist only after completion of the winding up of its business, which follows dissolution;[24] and a partnership can be dissolved without judicial action only by agreement of a majority of the

---

[24] Or. Rev. Stat. § 67.295(1).

Page 9 – MEMORANDUM DECISION

partners[25]—both partners in a two-partner partnership. But Victoria points to no evidence of Cattell's agreement to dissolve the partnership before or at the time of the MSA. For those reasons, I find that the reference in paragraph 6 to the "prior" partnership isn't an acknowledgement that the partnership no longer existed. But it is inconsistent with Victoria's argument that no business partnership was formed.

Finally, Victoria points to paragraph 11, an integration clause that she says terminates the partnership:

> The Parties understand and acknowledge that this Agreement and the Contract [between Victoria and Pizarro] as modified by this Agreement constitutes [*sic*] the full and complete agreement between the Parties regarding its subject matter, and that this Agreement and the Contract as modified by the Agreement supersedes any and all express or implied prior agreements, contracts, or understandings between the Parties.

The first part of paragraph, ending with "regarding its subject matter," says that the MSA states the parties' complete agreement "regarding its subject matter." The subject matter of the MSA is the set of circumstances on which the property will be sold, either to Pizarro or Cattell, and how certain specified debts will be paid. The sole MSA reference to the partnership in paragraph 6 doesn't constitute the parties' agreement to do anything with or about the partnership as such. So, the first part of paragraph 11 is best read as the parties' agreement that there are no other agreements between them

---

[25] Or. Rev. Stat. § 67.290(1).

about how the property should be sold or the debts paid—not an agreement that there would be no further partnership.

The second part of paragraph 11 states that the MSA supersedes prior agreements between the parties. It doesn't include the same qualifying phrase ("regarding its subject matter") that appears in the first phrase. Even if the absence of that phrase from the second part meant that the MSA superseded the partnership agreement, which Victoria doesn't argue, it's not clear what would be meant for a partnership agreement to be "superseded." A partnership exists until it is wound up after dissolution; it cannot simply go away because the partnership agreement has been superseded by another agreement. At best, the MSA should be read as steps the two partners agreed should be taken as part of the process leading to the partnership's dissolution and winding up.

The stipulated order, which was drafted and entered after the sale to Pizarro had failed, provided that Cattell would vacate the property by March 8, 2019, that he could reenter the property to remove some specified items, and that, if the property sold, the net proceeds would be placed in escrow and held there until further order, where they remain today.[26] Similarly, the order again makes no mention of any partnership and doesn't purport to alter, or even to describe, the parties' existing relationship.

---

[26] ECF No. 380 PDF 153 Ex. 117 at 2.

Page 11 – MEMORANDUM DECISION

I find that neither the MSA nor the stipulated order had the effect of dissolving or winding up the partnership.

### (c) *The partnership property*

In early 2015, Cattell caused Chelsea Trees, Inc., which he owned, to deed the property to Victoria. He and she dispute whether the property became partnership property.

There is a rebuttable presumption that property is separate property of a partner, rather than property of the partnership, if the partner acquired it in the partner's name without use of partnership assets and with no indication in the instrument transferring title to the property of the person's capacity as a partner or of the existence of a partnership, even if the property is used for partnership purposes.[27] Here, even though the deed by which the property was conveyed to Victoria did not mention the partnership or refer to her as partner, I find that Cattell has rebutted the presumption that the property became property only of her. I accept his testimony that he intended that both he and she develop the property and benefit from its appreciation. His intent is evidenced in part by the partnership balance sheet that he prepared, showing the property as a partnership asset.[28] Also, she gave nothing for the property. For years after the conveyance, he continued to live on the property and devoted most of his time and effort to its development. The mid-2017

---

[27] Or. Rev. Stat. § 67.065(4).
[28] ECF No. 400 Ex. 156.

agreement they signed, agreeing to dissolve the partnership, included an acknowledgment that it included "the land, structures, and equipment located at" the property and their Alaska fishing business.

I find that Cattell and Victoria formed a partnership before or in conjunction with the early 2015 conveyance of the property to her. The business of the partnership was both the ownership and development of the property and the Alaska fishing business, and I find that he contributed the property to the partnership. I reject his argument that he or she contributed other property to the partnership or that the partnership assumed any liabilities of either of them that preceded formation.

### (d) *Dissolution of partnership*

A partnership at will can be is dissolved by agreement of a majority of the partners, after which its business must be wound up.[29]

Here, Cattell and Victoria agreed to dissolution in mid-2017. Even without majority partner agreement on dissolution, a court may dissolve a partnership if dissolution and winding up of its business are "equitable."[30] Although she opposes a finding that a partnership exists, I don't read her arguments to include opposition to dissolution if a partnership exists.

To the extent dissolution did not occur in mid-June 2017, I will adjudge that the partnership be dissolved and that its business be wound up.

---

[29] Or. Rev. Stat. § 67.290(1).
[30] Or. Rev. Stat. § 67.290(5)(d).

## 2. Second claim: Equitable accounting

In the second claim against Victoria, Cattell requests "a full accounting of the partnership" for 2013 through 2019 and "an equitable division" of its assets and liabilities.[31]

Although Cattell's second claim requests an equitable accounting, the more appropriate and specific remedy is to give effect to the RPA provisions for addressing partner creditor claims upon a partnership's dissolution.

A partnership must reimburse a partner for payments made and indemnify a partner for liabilities incurred by the partner in the ordinary course of the business of the partnership or for preservation of its business or property.[32] The partnership must also reimburse a partner for payments made and indemnify a partner for an advance to the partnership beyond the amount of capital the partner agreed to contribute.[33] In winding up a dissolved partnership's business, the assets of the partnership must be applied to discharge its obligations to creditors, including partner creditors to the extent permitted by law.[34]

### (a) *Whether Cattell breached the MSA and caused the loss of the Pizarro sale*

In Victoria's closing-argument brief, she claims entitlement to recovery of certain amounts from Cattell. On pages 7 and 8 of her brief, she claims

---

[31] ECF No. 185 at 20 ¶¶ 86–88.
[32] Or. Rev. Stat. § 67.140(3).
[33] Or. Rev. Stat. § 67.140(4).
[34] Or. Rev. Stat. § 67.315(1).

Case 19-03123-dwh    Doc 551    Filed 10/11/22

entitlement to recover damages of $137,200. That amount is the sum of $65,000, the amount by which the price that Pizarro had agreed to pay for the property exceeded the price that Welch paid, and other amounts reflecting payments she made in 2018 and 2019.

Victoria alleges in her answer that Cattell breached the MSA by interfering with her effort to comply with the MSA and sell the property.[35] In her closing brief, she argues that he breached by recording his second notice of pendency of an action under Oregon Revised Statutes § 93.740 (previously known as a notice of *lis pendens*) on October 18, 2018, and by filing his lawsuit (the petition initiating the lead action in state court before removal) on the same day.[36]

Victoria does not identify any provision of the MSA that she contends Cattell breached by those actions, and I have found none.

The second notice of pendency, prepared and filed by Cattell's lawyer, gave notice of the petition and the possibility that it could have an effect on the property.[37] Those steps certainly could have delayed or prevented a sale closing that was imminent. But I see nothing in the MSA that was breached by Cattell asserting, even incorrectly, an ownership interest in the property. Even if Cattell had breached the MSA by filing the petition and second notice of pendency, Victoria hasn't proved that those acts caused the failure of the

---

[35] ECF No. 195 at 6 ¶ 37.
[36] ECF No. 546 at 5–6.
[37] ECF No. 400-117 Ex. 118.

sale to Pizarro. On February 28, 2019, Cattell's lawyer recorded a release of the second notice of pendency.[38] Pizarro terminated his purchase offer in May 2019. That Pizarro didn't terminate his offer until five months after the recording of the second notice of pendency suggests that he remained willing to buy in the interim. That conclusion is also consistent with Victoria waiting until after Pizarro's termination in May to recommence marketing efforts. If the recording of the second notice of pendency was improper, then Victoria could have obtained an early court order striking it. If it was proper, Cattell did nothing wrong. In either case, I'm unable to conclude that Cattell's petition and second notice of pendency breached the MSA or that the breach proximately caused the Pizarro sale failure.

### (b) *Other claims by Victoria*

On pages 12 through 16 of Victoria's closing brief, she addresses her "contribution claim" that exists "alternatively, if a partnership did exist." With that title in mind, and because there are apparent substantial overlaps between the amounts of her damage claims addressed on pages 7 and 8 and her contribution claim, I will treat the contribution claim as encompassing the earlier claims.

Victoria asserts a "contribution claim" of "not less than $265,533."[39] The amounts that comprise that total, listed on page 15, include $119,713 "paid to

---

[38] ECF No. 400-118 Ex. 119.
[39] ECF No. 546 at 12, heading A.

Page 16 – MEMORANDUM DECISION

the IRS for tax debt incurred in 2014 through 2017." To explain inclusion of the $119,713 amount paid to the IRS, Victoria explains that she liquidated her separate retirement accounts to pay "the IRS debt incurred during their relationship to prevent a tax lien from being assessed against the Property."[40] She doesn't allege whether or in what amount the tax debt she paid is attributable to partnership income. She expressly alleges that the partnership made no income in any of the years 2013 through 2017.[41] That she benefitted the partnership by preventing attachment of an IRS tax lien, which would have attached to her nominal title ownership of the property, doesn't entitle her to reimbursement if the tax was in fact not on account of partnership income.

I accept that the other components of Victoria's $265,533 contribution claim are amounts she paid in 2018 and 2019 to discharge debts incurred for partnership business.

Victoria concedes that she received from Pizarro $27,711 as a forfeited earnest-money deposit and $45,555 from the sale closing.[42] From the total amount of her contribution claim, $265,533, I have subtracted the IRS payments and her receipts, resulting in a net claim of $72,554.49. She is a partnership creditor for that amount.

---

[40] ECF No. 546 at 3.
[41] ECF No. 546 at 10–11.
[42] ECF No. 546 at 16.

Cattell provided insufficient evidence that any partnership assets or proceeds of partnership business were applied by Victoria other than to partnership obligations or that he is a partnership creditor, including on account of any partnership debts that he paid with his separate funds. I accept her explanation that any amounts that he deposited in 2018 and 2019 from his separate funds, which she concedes total $14,662 but in any case totaled not more than $29,260, were used to pay debts incurred during their relationship and expenses related to the property. Without those payments, the amount that she would have been able to pay creditors would have been correspondingly decreased and the amount she would now be owed by the partnership would be correspondingly increased.

The partnership has one asset: the $908.27 held in Victoria's lawyer's client trust account. Because partnership property must first be used to pay partnership creditors, that amount must be allocated to her, and she is entitled to retain it as her property. After crediting that amount to her $72,554.49 contribution claim, the balance is $71,646.22. If Cattell were to pay more than his half share of that balance, he would be entitled to contribution from Victoria for her half. Because the partnership has no other assets, she is entitled to recover from him half the amount of her net contribution claim, or $35,823.11.

### 3. Third claim: Setting Aside Preferences and Transfers

In the third claim against Victoria, Cattell asks that "preferences and transfers" be "set[] aside."[43] The third claim's title states that it is "as to [Victoria] and Williams." Williams is a now-dismissed defendant. The third claim alleges a prepetition payment by Cattell to Williams and includes other allegations apparently intended to state a claim for avoidance of a preference under Bankruptcy Code § 547.

For a payment to be avoided as preferential, section 547(b)(5) requires that it enable the creditor recipient to receive more than the creditor would have received had the payment not been made and the creditor received a chapter 7 bankruptcy dividend. But Cattell's third claim twists that allegation to apply it not to Williams, the recipient, but to "the defendants."[44] In the complaint's prayer with respect to the third claim, he requests judgment avoiding and recovering "the Preference Period Transfer, or the value thereof, from the Defendants for the benefit of the bankruptcy estates."[45] He seems to request that an allegedly preferential payment to Williams be recovered from Victoria (but not Welch, who isn't named in the third claim). A preference can't be recovered except from a transferee,[46] and

---

[43] ECF No. 185 at 20–21 ¶¶ 90–95.
[44] ECF No. 185 at 21 ¶ 94.
[45] ECF No. 185 at 29–30 ¶ 3.
[46] 11 U.S.C. § 550(a)(1).

Cattell does not argue or point to evidence showing why Victoria is a transferee of the payment he made to Williams.

Cattell is not entitled to relief on his third claim.

### 4. Fifth claim: Breach of fiduciary duty

In the fifth claim (the fourth claim is only against Williams), Cattell alleges that Victoria breached fiduciary duties to him and owes him damages of at least $195,000.[47]

Under Oregon Revised Statutes § 67.155(1), the duties of a partner are limited to the duties of loyalty and care. The duty of loyalty requires a partner to (1) account to the partnership and hold for it property or benefit derived from the business[48] and (2) refrain from dealing with the partnership in a manner adverse to it and to refrain from representing a person with an interest adverse to the partnership in the conduct or winding up of its business.[49] The duty of care requires a partner to refrain from grossly negligent or reckless conduct, intentional misconduct, or a knowing violation of law.[50]

The evidence does not support a finding that Victoria breached her duties of loyalty or care as defined in section 67.155. I don't accept Cattell's argument that she sold the property for an inadequate price. Under the

---

[47] ECF No. 185 at 23–24 ¶¶ 103–08.
[48] Or. Rev. Stat. § 67.155(2)(a).
[49] Or. Rev. Stat. § 67.155(2)(b).
[50] Or. Rev. Stat. § 67.155(3).

circumstances, including his resistance to her marketing and sale efforts, she acted reasonably. But in any case, there is no evidence that her conduct was grossly negligent, reckless, or in knowing violation of law or that it constituted intentional misconduct.

Cattell is not entitled to relief on his fifth claim.

### 5. Sixth claim: Abuse of a vulnerable person

In the sixth claim, Cattell seeks damages from Victoria for financially abusing him as a vulnerable person.[51] He alleges that he suffers from a significant cognitive impairment because he is autistic, and he is thus a "financially vulnerable person" under section 124.100.[52]

The phrase "financially vulnerable person" does not appear in section 124.100. That statute instead uses the term "vulnerable person" to refer to the entire class of persons who are protected by the financial-abuse statute. There are four subclasses of vulnerable persons, one of which is "[a] financially incapable person."[53] It's likely that the complaint drafter intended to allege that Cattell is a financially incapable person and mistakenly used the nonstatutory term "financially vulnerable person" instead.

### (a) *Financially incapable person*

"Financially incapable," as used in section 124.100, is defined in section 125.005(3). A person is financially incapable if unable to manage the

---

[51] ECF No. 185 at 24–25 ¶¶ 109–15.
[52] ECF No. 185 at 24 ¶ 110.
[53] ORS 124.100(1)(e)(B).

person's financial resources effectively for reasons including mental illness, mental retardation, or physical illness or disability. Somewhat awkwardly, section 125.005(3) defines "manage financial resources" as "those actions necessary to obtain, administer and dispose of real and personal property, intangible property, business property, benefits and income."[54] I take the statute to mean that "**managing** financial resources" means "**taking** those actions necessary to obtain" and so on.

Despite the length of this definition, it still contains many technical terms that are not further defined, including "mental illness" and "mental retardation." But, however those terms are defined, it's clear from the evidence that Cattell does not meet this definition of a "financially incapable" person. The record makes it abundantly clear that he can manage his financial resources. He has owned and operated several businesses, including ones engaged in commercial fishing and contracting. He has bought and sold several properties over his career. He is adept at using computers, particularly QuickBooks, is familiar with the concept of double-entry bookkeeping, and regularly produces—and did for trial—financial-statement reports of his and his businesses' finances. He prepared a detailed analytical document to aid in development of the property as a resort. Whatever other difficulties he may have, there can be no doubt that he is able to obtain, administer, and dispose of real and personal property.

---

[54] Or. Rev. Stat. § 125.005(3).

Cattell is not a financially incapable person.

## (b)   *Person with a disability*

In addition to the financially incapable person subclass of vulnerable person, there are three other subcategories, one of which is "person with a disability," which is defined in section 124.100(1)(d). Although Cattell's sixth claim does not use the term "disability," it does allege that he has a "cognitive impairment /physical [*sic*] condition."[55] Because "mental impairment" is one of the elements that defines "person with a disability," I will address whether Cattell fits in that subclass.

On summary judgment, the parties dedicated considerable attention to whether Cattell has autism. At trial, Dr. Karen McKibbin testified that he meets the diagnostic criteria of autism level one, or Asperger's disorder and may have some difficulty interacting with people.

But, ultimately, the evidence does not support the primary element of section 124.100(1)(e)(D)—the requirement that the person be a "person with a disability." The latter phrase is defined to require that the person have—

> a physical or mental impairment that . . . [p]revents performance of substantially all the ordinary duties of occupations in which an individual not having the physical or mental impairment is capable of engaging, having due regard to the training, experience and circumstances of the person with the physical or mental impairment"[56]

---

[55] ECF No. 185 at 24 ¶ 110.
[56] Or. Rev. Stat. § 124.100(1)(d)(B).

There is no evidence that Cattell's impairment fits that definition. I conclude that his autism does not make him a person with a disability under section 124.100(1)(e)(D).

## (c) *Elderly person*

Another subclass of vulnerable person is "elderly person"—one 65 years of age or older.[57]

Cattell did not allege in the complaint that he was 65 years of age or older at the time of any of the occurrences in the complaint. Nor did he offer evidence to that effect at trial.

## (d) *Vulnerable person*

Even if Cattell had proved that he is a vulnerable person for any of the above reasons, to recover, he would also have had to prove that he suffered physical or financial abuse.[58] There is no evidence that he suffered physical abuse. With irrelevant exceptions, to prove financial abuse, a plaintiff must prove that a defendant wrongfully took or appropriated the plaintiff's money or property.[59] There was no evidence that Victoria (or Connor) took any money or property from him wrongfully.

Cattell is not entitled to relief on his sixth claim against Victoria.

---

[57] Or. Rev. Stat. § 124.100(1)(a), (1)(e)(A).
[58] Or. Rev. Stat. § 124.100(2), (4).
[59] Or. Rev. Stat. § 124.110(1)(a).

## 6.      Seventh claim: Declaratory judgment

The seventh claim's title says it's against both Victoria and Welch. It concludes in paragraph 122 by asserting that "[Cattell] is entitled to equitable relief to void the transfer deed upon [Cattell] paying Welch his purchase price and attendant closing costs . . .." The preceding paragraphs imply that Cattell requests this relief on the ground that Victoria lacked legal authority to sell the Skyliners property to Welch. The claim appears to request a declaration, as a general matter of Oregon law, that the sale to Welch was unlawful and that he knew so. Despite the reference to "equitable relief to void the transfer deed," the claim is captioned "Declaratory Judgment . . . against [Victoria] and Welch," and other paragraphs in that claim seem to say, consistently with the caption but inconsistently with the reference to "void[ing]" the deed, that Cattell seeks only a declaratory judgment that the transfer was improper. I therefore interpret the claim as requesting only declaratory relief.

The complaint cites the Oregon declaratory-judgment statute. That statute doesn't apply in federal court; the applicable statute is 28 U.S.C. § 2201. But the difference is not important to my analysis.

The requested declaration is that Victoria's sale of the property to Welch was unlawful. The complaint doesn't spell out why that is the case. Even though the MSA did not affirmatively authorize Victoria to sell to anyone other than Pizarro, it did not forbid her from doing so. So, to the extent that

the seventh claim is premised on a contention that she violated the MSA by selling to Welch, I disagree that the sale was unlawful.

I found above, addressing the first claim, that the property belonged to the partnership. For that reason, I agree with Welch[60] that the validity of the transfer as against him depends on section 67.095. That section governs transfers of property owned by a partnership. Under section 67.095(1)(c)—

> Partnership property held in the name of one or more persons other than the partnership, without an indication in the instrument transferring the property to them of their capacity as partners or of the existence of a partnership, may be transferred by an instrument of transfer executed by the persons in whose name the property is held.

In other words, if property belongs to a partnership, but title to the property is in the name of someone other than the partnership itself and the person who holds title to the property transfers it to another person, the transfer is valid.

Section 67.095(1)(c) describes precisely the events that Cattell alleges occurred. The Skyliners property was undisputedly titled in Victoria's name, although I have found that it really belonged to the partnership. And she— who held title to the property—sold it to Welch. So, section 67.095(1)(c) made the transfer effective, and Welch legitimately acquired title. Whether she acted properly by selling it is a different question. For the seventh claim, what matters is that the transfer was legitimate and valid.

Cattell is not entitled to relief on his seventh claim against Victoria.

---

[60] ECF No. 544 at 7–9.

## 7.  Eighth claim: Avoidance of fraudulent transfers

The eighth claim is captioned "Avoidance of Fraudulent Transfers" and concludes with a request for "equitable relief to void the transfer deed upon [Cattell] paying Welch his purchase price . . .."[61] The relief requested here is the same as that in the seventh claim, except here it's clear that Cattell really is requesting avoidance of the transfer rather than only a declaration that the transfer was improper. But in this claim, he characterizes the transfer as "fraudulent" in the sense that the property was sold for less than a reasonably equivalent value when Cattell was insolvent.

The eighth claim as described in the complaint is based on Bankruptcy Code § 548(a)(1).[62] That section authorizes the bankruptcy trustee to "avoid any transfer . . . of an interest of the debtor in property . . . that was made or incurred on or within 2 years before the date of the filing of the petition."

The fatal problem with the eighth claim is that section 548 allows avoidance only of a transfer of "an interest of the debtor in property." Here, Cattell is the debtor. When Victoria sold the property, he didn't own it. He argues that it was not her property, but instead it was the property of the partnership. I agree and have so found above. But that still doesn't mean that the owner of the property was Cattell himself. Because the property was not his property when it was sold, he cannot recover it under section 548.

---

[61] ECF No. 185 at 28 ¶ 127.
[62] ECF No. 185 at 28.

Case 19-03123-dwh    Doc 551    Filed 10/11/22

I will deny relief to Cattell on the eighth claim against Victoria.

### 8.    Ninth claim: Avoidance of preference payments

The ninth claim is captioned "Avoidance of Preference Payments." Although the term "preference" ordinarily refers to a prebankruptcy payment made to a creditor that gives the creditor preferential treatment in comparison to other creditors, this claim for relief also contains a reference to section 548, which is unrelated to preferences but instead addresses fraudulent transfers. The ninth claim says nothing about any creditors to whom any preferential or fraudulent payments might have been made, but as far as I know Welch is the only defendant who is alleged to have ever received a transfer of any kind, so I will assume that the ninth claim is intended to refer to the sale of the property to him.

To the extent that the ninth claim really is intended to seek recovery of an allegedly fraudulent sale to Welch, it duplicates the eighth claim. And to the extent that it seeks to recover from Welch an actual preferential payment in the sense in which that term is used in the preference-recovery provision of the Bankruptcy Code, § 547, the complaint doesn't allege either that the transfer was of "an interest of the debtor in property" or that the transfer was "for or on account of an antecedent debt owed by the debtor before such transfer was made."[63]

Cattell is not entitled to relief on his ninth claim against Victoria.

---

[63] 11 U.S.C. § 547(b)(2).

Case 19-03123-dwh    Doc 551    Filed 10/11/22

### 9. Tenth claim: Equitable subordination

The tenth claim is entitled "equitable subordination." Complaint

paragraph 132 requests that—

> In the alternative to the eighth and ninth claims for relief, to the
> extent the security interests transferred or created as part of
> any of the transactions more specifically set forth in paragraph
> 44 - 110 are deemed valid, they should be equitably
> subordinated to the partnership or the estate.

It's not clear what Cattell means by "the security interests transferred or

created by any of the transactions" and the security interests being "deemed

valid." The only other reference in the complaint to "security interest"

(singular) is in paragraph 100, which refers to a grant of collateral to

Williams. Paragraph 102 asks that Williams's status as a secured creditor

and lienholder on the property be subordinated to other creditors.

Because the tenth claim does not appear to request relief against anyone

but Williams, I will deny relief to Cattell on the tenth claim against Victoria.

### D. Victoria's counterclaims against Cattell

In Victoria's answer, she includes a section entitled "[Victoria's] Claims

against Cattell."[64] She asks that this court determine the extent and amount

of her creditor claim, including six counterclaims (which she calls counts).

### 1. First counterclaim: Dissolving the relationship by enforcing the MSA and compelling arbitration

In Victoria's first counterclaim, the asks that the "relationship" between

Cattell and Victoria "be appropriately dissolved or resolved" and that this

---

[64] ECF No. 195 at 10–13 ¶¶ 70–93.

court "uphold the State court's Order Enforcing the MSA and compel the parties to return to arbitration."[65]

In ruling on Cattell's second claim for relief, I have considered and ruled on all of Victoria's claims for monetary relief against Cattell. She doesn't say what more she requests in the form of enforcement of the MSA.

Under the Federal Arbitration Act, a court considering a dispute subject to arbitration under a written arbitration agreement must stay trial of the action pending arbitration—"on application of one of the parties."[66] Even where a party does seek a stay pending arbitration, its "extended silence and delay in moving for arbitration" can constitute waiver of the right to arbitrate, and a "statement by a party that it has a right to arbitration in pleadings or motions is not enough to defeat a claim of waiver."[67] A waiver is not defeated by the absence of prejudice.[68]

Here, Victoria did not request a stay of the trial, which has been completed. Any issue that might have been arbitrated has been tried and is decided in this decision. She has pointed to no authority requiring a referral to arbitration under this circumstance. She has waived the right to compel arbitration.

---

[65] ECF No. 195 at 11 ¶¶ 73–74.
[66] 9 U.S.C. § 3.
[67] Martin v. Yasuda, 829 F.3d 1118, 1125 (9th Cir. 2016).
[68] Morgan v. Sundance, Inc., 142 S.Ct. 1708 (2022).

### 2.     Second counterclaim: Dissolving or resolving the domestic partnership

In Victoria's second counterclaim, in the alternative, she alleges that the assets and debts that Cattell and she contributed to a domestic partnership be divided justly and equitably under Oregon law.[69] She also requests an equitable accounting of their finances, transfers, and other financial information during their relationship.[70] She also requests an equalizing judgment against Cattell for specified amounts.

In ruling on Cattell's first claim for relief, I found that the parties formed a business partnership and not just a domestic partnership. And in addressing his second claim for relief, I otherwise resolved all the requests for economic relief that Victoria raised in her closing brief.

### 3.     Third counterclaim: Intentional interference with economic relations

In Victoria's third counterclaim, entitled "In the alternative, Intentional Interference with Economic Relations," she alleges that Cattell intentionally interfered with her sale of the Skyliners property when he repeatedly filed notices of pendency of action and the state-court lawsuit in violation of the MSA, which actions and interference ultimately resulted in loss of sale of the property to Pizarro for $920,000.[71] She also requests a judgment for specified

---

[69] ECF No. 195 at 11 ¶ 76.
[70] ECF No. 195 at 11 ¶ 77.
[71] ECF No. 195 at 12 ¶ 80.

amounts and recovery from Cattell for any liability she is determined to have to Welch arising from the sale of the Skyliners Property.[72]

The reference to "repeatedly" filing notices of pendency may be an invocation of the first and third notices, in addition to the second, which I've already addressed. The first preceded the MSA, so it couldn't have interfered violated the MSA, and the third followed—and thus couldn't have caused—Pizzaro's withdrawal of his purchase offer. Welch has not asserted any claim against Victoria. In my ruling on Cattell's second claim, I otherwise resolved all the requests for economic relief that Victoria raised in her closing brief.

Victoria is not entitled to relief on her third counterclaim.

### 4.    Fourth counterclaim: Breach of fiduciary duty

In Victoria's fourth counterclaim, to the extent the court finds that a partnership existed, she requests "in the alternative" an award of damages of "at least" $205,000 for Cattell's breach of his partner duties by maintaining separate secret bank accounts, secretly transferring funds to Patty Gough between 2013 and 2017, instructing Victoria to stop her tax withholding from her wages, generally transferring Victoria's sole and separate wages and financial resources for his sole benefit, and materially misrepresenting the value of the property to Victoria and her creditors.[73]

---

[72] ECF No. 195 at 12 ¶ 82.
[73] ECF No. 195 at 12 ¶¶ 84–86.

Victoria did not prove that she reasonably relied on any advice from Cattell to stop tax withholding. She had an independent obligation to comply with the law; he is not a lawyer or tax accountant; and she did not prove that he overcame her ability to make her own decisions. She offered no evidence regarding transfers to Gough. She offered no evidence that she was damaged by Cattell's maintenance of any separate, secret bank accounts. She offered no evidence that his access to her bank account was without her consent or that he made any specific transfers without her consent. She offered no evidence that she was damaged by any misrepresentation by him of the value of the property.

Victoria is not entitled to relief on her fourth counterclaim.

### 5.    Fifth counterclaim: Attorney fees

In Victoria's fifth counterclaim, she requests payment of her reasonable attorney fees incurred in this action due to Cattell's breach of the MSA and violation of state-court orders in filing repeated notices of pendency and interfering with the sale of the property. She also requests attorney fees incurred in this action because he asserted claims without a reasonably objective basis.[74]

I have found above that Cattell did not breach the MSA. In any case, Victoria does not identify a provision of the MSA allowing the recovery of attorney fees by the prevailing party in litigation to enforce it, and I have

---

[74] ECF No. 195 at 13 ¶ 88.

Case 19-03123-dwh    Doc 551    Filed 10/11/22

found none. And she does not explain how Cattell's assertion of claims without a reasonably objective basis states a claim for relief, as opposed to possible violation of Federal Rule of Bankruptcy Procedure 9011, which can be raised only by motion under the conditions of that rule.

Victoria is not entitled to relief on her fifth counterclaim.

### 6.      Sixth counterclaim: Nondischargeability

In Victoria's sixth counterclaim, she requests that her claim be excepted from discharge under Bankruptcy Code §523(a)(2), (4), and (6) because Cattell intentionally interfered with the terms of the MSA, resulting in damages exceeding $59,400.[75]

For her section 523(a)(2) claim, Victoria first alleges that Cattell's intentional inference with the terms of the MSA damaged her, and the resulting debt is for "false pretenses, false representations, and/or actual fraud." I have previously found that Cattell did not breach the MSA. If she relies on a cause of action for "interference" with the MSA, she points to no authority for such a claim. If she meant to refer to the tort of interference with economic relations—which she did expressly invoke in her third counterclaim—an element of that tort is the existence of a professional or business relationship between the plaintiff and a third party with which the

---

[75] ECF No. 195 at 13 ¶¶ 90–93.

defendant intentionally interferes.[76] But she points only to the relationship evidenced by the MSA—between her and Cattell.

For her section 523(a)(4) claim, she alleges that her claim is for "fraud and/or defalcation while acting in a fiduciary capacity, embezzlement, or larceny." She does not explain why the evidence supports any of those grounds for nondischargeability, and I see none.

For her section 523(a)(6) claim, she alleges that Cattell willfully and maliciously injured her, again by intentionally interfering with the MSA. For the reason that I find her section 523(a)(2) claim deficient, I make the same finding for her section 523(a)(6) claim.

Victoria is not entitled to relief on her sixth counterclaim.

## IV.    Connor

In the nonlead action, Connor is the only remaining defendant.

### A.    *Jurisdiction*

As is the case with the claims between Cattell and Victoria, the claims by Cattell against Connor are related to the main case because resolution of the claims could result in a recovery by Cattell, which in turn could affect the administration of the estate.

Unlike in the lead action, where all remaining parties—including Cattell—have expressly consented to entry of final judgment by the bankruptcy court, I find no express record of either Cattell or Connor

---

[76] Cron v. Zimmer, 296 P.3d 567, 575 (Or. App. 2013).

consenting in the nonlead action to entry of final orders or judgment by the bankruptcy court. On the other hand, the April 10, 2020, letter from Cattell's lawyer, Terry Scannell, stated with respect to the nonlead action that "[a]ll Defendants have consented to the jurisdiction of this Court and to entry of a final judgment."[77] No one has objected to that statement by Scannell. I read that letter not only to state that Connor consented, but also implicitly to represent that Cattell consented; if Cattell hadn't consent, Scannell would have had little reason to report the defendants' consent, which would be irrelevant absent Cattell's.

Federal Rule of Bankruptcy Procedure 9027(e)(3) requires that, after removal, a nonremoving party who has filed a pleading in the removed action "file a statement that the party does or does not consent to entry of final orders or judgment by the bankruptcy court." Cattell, a nonremoving party, didn't do so. Rule 7012(b) and Local Bankruptcy Rule 7012-1 require that a defendant's answer state consent or lack of consent; Connor's answer did not do so.[78] Consent to entry of final orders or judgment in a noncore proceeding need not be express but may be implied.[79] Here, Scannell's letter implies Cattell's consent and states Connor's consent, which Connor hasn't denied. Inferring Cattell's consent is consistent with Scannell's letter and Cattell's

---

[77] ECF No. 25 at 3.
[78] ECF No. 37.
[79] Wellness Intern. Network, Ltd. v. Sharif, 575 U.S. 665, 683–85 (2015); *In re* Daniels-Head & Assocs., 819 F.2d 914, 918–19 (1987).

failure to file a statement of nonconsent under Rule 9027(e)(3); and inferring Connor's consent is consistent with his failure to file a statement of nonconsent under Rule 7012(b) and LBR 7012-1(b) and to dispute Scannell's statement that Connor consented. Inferring Cattell's consent is also consistent with his express consent in the consolidated lead action.

I find that Cattell and Connor have consented to entry of final orders or judgment by this court in the nonlead action.

### B. Claims

#### 1. First: Breach of fiduciary duty

Cattell's first claim against Connor is that Connor breached fiduciary duties to Cattell in the following ways:

> 1. By designing a plan to engage in a systematic actions [*sic*] to lock the Plaintiff out of all the partnership accounts and divert as much money as possible to Victoria at the expense of the Plaintiff. . . ..
>
> 2. By aiding and abetting in the breach of Victoria's fiduciary duties to the Plaintiff. . . ..
>
> 3. Failing to disclose to the Plaintiff that Connor and Victoria were working together to strip the partnership of all its assets and divert those assets to the greatest extent possible to Victoria to the detriment of the Plaintiff and leaving the Plaintiff with the liabilities of the partnership and none of its assets.
>
> 4. Aiding and abetting in engineering the insolvency o the Plaintiff. . . ..
>
> 5. Taking at least $3,000 in partnership assets for himself . . .."

Fiduciary-breach allegations 1, 3, and 5 depend on proof that Connor owed a fiduciary duty directly to Cattell. I conclude that he owed no such duty.

According to Connor's testimony, which I believe, he became involved in Victoria's finances in June 2017, when he learned that she had relapsed into drinking heavily and was in dire financial straits. Connor didn't know Cattell well and rarely communicated with him, although he did meet him and exchanged emails with him. There is mixed evidence whether Connor's help to his mother included professional CPA services or just help that any dutiful child would provide for a parent in need. But, even if Connor's help included professional CPA services, that wouldn't support Cattell's assertion. There is no evidence that Connor ever undertook to provide CPA services to Cattell. If Cattell subjectively assumed that Connor was working for him as a CPA, that assumption was unwarranted.

Breach allegations 2 and 4 allege that Connor is secondarily liable for aiding and abetting Victoria's breaches of fiduciary duties to Cattell. But I have found above that she did not breach any fiduciary duties to Cattell. In the absence of her liability to Cattell, Connor can't be secondarily liable.

Cattell is not entitled to relief on his first claim against Connor.

## 2.    Financial abuse of a vulnerable person

Cattell's second claim against Connor is for financial abuse of a vulnerable person. It is essentially identical to the sixth claim in the lead complaint.

For the same reasons that Cattell is not entitled to relief on his sixth claim against Victoria, he is also not entitled to relief on his second claim against Connor.

### 3. Estoppel

Cattell's "estoppel" asserts that that Connor made but breached a promise to provide services to the partnership. The claim is based on the doctrine of promissory estoppel. In the Oregon Supreme Court's 2013 decision in *Cocchiara v. Lithia Motors, Inc.*,[80] it adopted the Restatement (Second) of Contracts conception of promissory estoppel:

> A promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise. The remedy granted for breach may be limited as justice requires.

There is no evidence that Connor ever made any promise to Cattell.

Cattell is not entitled to relief on his third claim against Connor.

## V. Welch

### A. *Jurisdiction*

As noted above, Cattell expressly consented to this court's entry of final orders or judgment in the lead action, which is against only Victoria and Welch. Welch gave the same express consent in his answer.[81]

### B. *Claims*

Although the caption of the lead-action's second-amended complaint does not include Welch's name as a defendant, the body of the complaint includes

---

[80] 297 P.3d 1277, 1283 (Or. 2013).
[81] ECF No. 215 at 2 ¶ 1.

claims against him, and the parties have proceeded as though he were named in the caption.

The complaint's seventh through tenth claims are against Welch in addition to Victoria. For the same reasons that Cattell is not entitled to relief on those claims against Victoria, he is also not entitled to relief on them against Welch.

## VI.    Conclusion

On Cattell's first claim against Victoria, I will dissolve the partnership to the extent it wasn't previously dissolved. This decision has the effect of winding up its business.

On Cattell's second claim against Victoria, I will allow her to retain the $908.27 held in her lawyer's client trust account and to recover from Cattell $35,823.11. Her disputed proof of claim is for $71,000. I will allow the claim for $35,823.11. Her claim arose from his actions before his bankruptcy, and her right to enforce it is subject to the law applicable to enforcing such claims.

I will deny relief on Cattell's remaining claims against Victoria, her counterclaims against him, and his claims against Connor and Welch.

I will prepare a judgment and claim-allowance order.

# # #

cc: Thomas Bryon Cattell